2026 Tex. Bus. 26



## The Business Court of Texas, Eleventh Division

| | | |
|---|---|---|
| WESTLAKE LONGVIEW CORP. and WESTLAKE CHEMICAL OPCO LP, *Plaintiffs*, v. EASTMAN CHEMICAL CO., *Defendant*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 24-BC11B-0023 |

### Memorandum Opinion & Order on Motion for Summary Judgment

¶1 Before the Court are Westlake Longview Corp.'s motion for traditional summary judgment (the MSJ); Eastman Chemical Co.'s objections to Westlake's summary judgment evidence (Eastman's Objections); and Westlake's objections and motion to strike Eastman's summary-judgment evidence (Westlake's Objections). As detailed below, the MSJ is **GRANTED in part** and **DENIED in part**; Eastman's Objections are **SUSTAINED in part** and **OVERRULED in part**; and Westlake's Objections are **SUSTAINED in part** and **OVERRULED in part.**

## Applicable Law

¶2      The parties agree that Delaware law governs their contract for ethylene sales and exchanges (the ESA), which contains a Delaware choice of law provision.[1]

¶3      Like Texas, Delaware "holds parties' freedom of contract in high regard."[2] And like Texas courts, Delaware courts read contracts as a whole, seeking an internally consistent interpretation that gives the contract language its plain and ordinary meaning, effectuates all of the contract language so that none is rendered superfluous, and gives effect to the parties' intent as reflected within the four corners of the contract.[3] Delaware courts apply an objective standard, construing a contract as an objective, reasonable third party would understand it.[4]

¶4      Also like Texas courts, Delaware courts enforce the plain meaning of clear and unambiguous contract language—i.e., language susceptible to only one reasonable interpretation.[5] Contract language need not be perfectly clear for an

---

[1] MSJ Exh. 1 (ESA) § 12.

[2] *Thompson St. Cap. Partners IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1165–66 (Del. 2025) (quoting *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024)); *Origis USA LLC v. Great Am. Ins. Co.*, 345 A.3d 936, 952 (Del. 2025) (quoting *Thompson*); *Vill. Prac. Mgmt. Co. v. West*, 342 A.3d 295, 313–14 (Del. 2025) (also quoting *Thompson*).

[3] *Thompson St. Cap.*, 340 A.3d at 1166, 1167; *Origis USA*, 345 A.3d at 952; *Vill. Prac.*, 342 A.3d at 314; *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[4] *Vill. Prac.*, 342 A.3d at 314; *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025); *Sunline*, 206 A.3d at 846; *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[5] *Thompson St. Cap.*, 340 A.3d at 1166; *Origis USA*, 345 A.3d at 952.

interpretation to be the only reasonable one;[6] even a problematic reading can be reasonable.[7] But if contract language is susceptible to more than one reasonable interpretation or meaning, it is ambiguous[8]—even if one such interpretation is more reasonable than the other(s).[9] If a contract is unambiguous, extrinsic evidence generally may not be used to vary its meaning or create an ambiguity;[10] but if a contract is ambiguous, courts may look beyond the four corners of the contract to consider extrinsic evidence, such as the course of dealing between the parties, custom and usage in the industry, and the parties' overt statements and acts.[11]

¶5　　Unlike Texas, however, Delaware law implies into every contract a covenant of good faith and fair dealing.[12] Delaware courts rely on this implied covenant to infer contract terms to handle unforeseen developments or to bridge

---

[6] *Thompson St. Cap.*, 340 A.3d at 1166; *Origis USA*, 345 A.3d at 952.

[7] *Vill. Prac.*, 342 A.3d at 314 ("[A]n interpretation can be at once both reasonable, though problematic." (quoting *BitGo Holdings, Inc. v. Galaxy Digit. Holdings, Ltd.*, 319 A.3d 310, 322–23 (Del. 2024)).

[8] *Thompson St. Cap.*, 340 A.3d at 1166; *Osborn*, 991 A.2d at 1159–60.

[9] *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1144 (Del. 2025).

[10] *BitGo Holdings, Inc.*, 319 A.3d at 323; *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[11] *Energy Transfer, LP v. Williams Cos.*, 346 A.3d 1089, 1116 (Del. 2023) (quoting *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)); *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014) (quoting same); *see also Sunline*, 206 A.3d at 847, 848.

[12] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026); *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022); *see also Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 620 n.37 (Del. 2023).

3

contractual gaps or when necessary to protect the reasonable expectations of the parties.[13] In the latter context, the implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct [that] has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[14]

### The ESA

¶6　As part of a transaction in 2006, Eastman sold Westlake its polyethylene facilities in Longview, Texas and a pipeline that runs from Longview to a major ethylene trading hub in Mont Belvieu, Texas. Before the sale, Eastman owned "crackers" that produce ethylene in Longview, a polyethylene facility in Longview that was the largest customer for that ethylene, and the pipeline that was the principal means for getting ethylene out of Longview. Essentially, Eastman was its own biggest supplier, customer, and transporter in Longview. After the transaction, Eastman would still own the crackers (the local supplier), but Westlake would own the polyethylene facilities (the local customer) and the pipeline (the key means for reaching non-local customers). To address this situation, the parties executed the ESA, a long-term agreement securing Westlake an opportunity to buy

---

[13] *Johnson & Johnson*, 352 A.3d at 253–54; *Baldwin*, 283 A.3d at 1116–17.

[14] *Terrell*, 297 A.3d at 620 n.37 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

Eastman's Longview ethylene and Eastman an opportunity to get ethylene not purchased by Westlake to customers outside of Longview.

¶7    **Overview.** As reflected in its opening sentences and consistently throughout the document, the ESA has two principal functions. The first function, which only applied to the first few years after the sale and expired some 15 years ago, guaranteed Eastman a supplier and Westlake a buyer for fixed amounts of Longview ethylene (the Purchased Ethylene).[15] The second function, which applies throughout the ESA's term and governs the parties' conduct today, requires Eastman to offer, and Westlake to either buy or exchange, Eastman's "Excess Ethylene Quantities" (EEQ),[16] which includes all ethylene produced by Eastman's Longview crackers, subject to limited exclusions and a cap.[17]

¶8    **Nominations.** Eastman's right of first refusal has two stages: annual and monthly.[18] First, before the beginning of the year, Eastman must offer Westlake the EEQ it intends to produce in the coming year; any amount Westlake does not timely commit to purchase may then be contracted to third parties for that one-year period.[19] Second, any EEQ not sold to Westlake or third parties under the annual

---

[15] *See* ESA at 1, § 4.

[16] *Id.* § 4(c)–(f).

[17] *Id.* § 4(a)–(b).

[18] *Id.* §§ 4(e)–(f), 5.

[19] *Id.* § 4(f).

5

nominations process must be offered to Westlake again on a month-to-month basis;[20] here too, any EEQ Westlake does not purchase may then be sold to third parties.[21] The overarching structure of this set up is that Westlake has a right of first refusal on annual contracts for Eastman's EEQ and a right of first refusal on monthly sales of Eastman's EEQ.[22] In other words, Westlake has an opportunity to take advantage of favorable price differentials based on projections for the coming year and favorable price differentials based on current monthly pricing. In return, Eastman gets free exchange on the pipeline for any EEQ Westlake does not buy.[23]

¶9    **Delivery & Pricing.** Whether Westlake purchases the EEQ or exchanges it for Eastman, Eastman delivers the EEQ to Westlake via the distribution grid in Longview.[24] Westlake then pays the contract price for the EEQ it purchases[25] and delivers a like kind and equivalent quantity of ethylene to Eastman in Mont Belvieu for EEQ it exchanges, at no charge.[26] The ESA also contemplates that Eastman (the seller under the ESA) may sometimes need to buy ethylene from another seller (outside the ESA); in that event, the delivery process

---

[20] *Id.*

[21] *Id.* § 4(e).

[22] *Id.*

[23] *See* "The MSJ," Part A(4) and B(1), *infra.*

[24] *See* ESA §§ 2, 5.

[25] *Id.* § 8, 8(a).

[26] *Id.* §§ 4(g), 8(b).

works in reverse: Westlake delivers the ethylene from Mont Belvieu to Longview.[27]

But unlike the free exchange for EEQ exchanged under the ESA, Westlake's exchange of ethylene purchased by Eastman outside the ESA is not free: Eastman must pay Westlake a fee.[28]

## The MSJ

¶10    In its MSJ, Westlake seeks summary judgment on the following declaratory judgments:

> Section 4(f) requires Eastman to offer, in good faith, all EEQ it intends to produce in the following year to Westlake in the annual nomination.
>
> Under Section 4(f) of the ESA, should Westlake decline all or a portion of the annual nomination, Eastman has until December 31 to seek third-party one-year contracts for the quantity of ethylene declined by Westlake.
>
> As part of the monthly nominations process under the ESA, Eastman is required to nominate all EEQ that it will produce in the corresponding month that is not already contracted for sale to a third party under a one-year contract executed by 12/31 of the preceding year; and spot sales do not qualify as third-party contracts sufficient to withhold ethylene from this monthly EEQ nomination.
>
> Eastman violates the terms of the ESA when it withholds ethylene from its monthly EEQ nomination for sale to Westlake that is not subject to third-party one year firm sales contracts (even if Westlake declined all or part of the annual nomination).
>
> Westlake has the right to purchase any and all portions of Eastman's monthly nomination of EEQ.

---

[27] *Id.* §§ 7, 8(b).

[28] *Id.* § 8(b).

Eastman's third-party sales of ethylene are not entitled to free exchange under the ESA.

Exchanged Ethylene under the ESA is limited to EEQ that Eastman nominates for purchase by Westlake as part of Eastman's nomination for the corresponding month and that Westlake has declined to purchase in that month.

The Westlake OpCo pipeline tariff applies to all quantities of ethylene for which Eastman seeks an exchange but withholds from its nomination for the corresponding month.

The ESA only provides a right of free exchange for quantities of ethylene that are produced in a given month, properly nominated for sale to Westlake for that month, *and* are declined by Westlake as part of Eastman's nomination for the corresponding month.

Ethylene held in inventory is not entitled to free exchange.

Ethylene converted or tolled is not EEQ, and therefore not subject to free exchange.

Under the ESA, Westlake is not obligated to fulfill its annual purchase commitment, if any, through pro-rata purchases each month.

¶11    The Court **GRANTS in part** and **DENIES in part** the requested declarations, as follows. Because several of the requested declarations overlap and not all of them can be granted or denied as a whole, the Court addresses them categorically below.

A.    **Annual Nominations**

1. **In its annual nominations, Eastman must, in good faith, offer to sell Westlake all EEQ it intends to produce in the following calendar year.**

¶12    Section 4(f) of the ESA states: "Eastman will offer for sale to Westlake by June 30 of each year for the following year the amount of [EEQ] that it intends

8

to produce in the following year."[29] Additionally, Delaware law imposes a covenant of good faith and fair dealing.[30] Thus, in its annual nominations, Eastman must, in good faith, offer to Westlake all EEQ it intends to produce in the following year.[31] Eastman did not argue otherwise in its briefing and stated at the summary-judgment hearing that it did not disagree with this contention.

### 2. The ESA does not require Westlake to satisfy its annual purchase commitment in equal monthly installments.

¶13    Once Eastman makes its annual EEQ nomination, Westlake has until August 31 to notify Eastman how much of the EEQ Westlake will commit to purchase for the coming year (hereafter, Committed EEQ).[32] The parties dispute when during that year the Committed EEQ must be delivered/accepted. Although the ESA provides for Purchased Ethylene to be delivered "ratably over any mutually agreed upon period,"[33] it does not provide for ratable delivery of the Committed EEQ. Eastman contends that Westlake must purchase the Committed EEQ in equal monthly installments and argues that not requiring equal installments would be

---

[29] ESA § 4(f).

[30] *See, e.g.*, *Terrell*, 297 A.3d at 620 n.37; *Dunlap*, 878 A.2d at 441–42.

[31] *See* ESA § 4(f). This obligation is subject to a contractual minimum requirement. *See id.*

[32] *Id.*

[33] ESA § 4.

commercially unreasonable.[34] Westlake points out that the ESA says nothing about when it must purchase the Committed EEQ.

¶14    The Court agrees with Westlake that the ESA does not require it to purchase Committed EEQ in equal monthly installments. The ESA says nothing to that effect, and it is not inherently commercially unreasonable for Westlake to buy more EEQ in one month than another. To the contrary, the summary-judgment evidence shows that the parties' production and needs vary throughout the year.[35]

¶15    The fact that the ESA does not require equal monthly installments does not leave Westlake entirely unrestrained. The ESA's requirement that Eastman prorate its EEQ on an approximately equal monthly basis necessarily places practical limits on how much of its annual commitment Westlake can accept or not accept in any given month without risk of breaching its annual commitment. Likewise, planned turnarounds, which may alleviate Eastman's delivery obligations under the ESA,[36] will naturally affect how an annual commitment is allocated. Plus, Delaware law's implied covenant of good faith and fair dealing prevents Westlake

---

[34] MSJ Resp. at 36–38. Eastman also relies on course-of-performance evidence, which is addressed separately below. *See* "Evidentiary Rulings," Part A(3), *infra.*

[35] MSJ at 34–36 and Exhs. 37–39.

[36] ESA § 6.

from structuring its purchase of committed EEQ in an arbitrary or unreasonable manner that prevents Eastman from receiving the benefits of the bargain.[37]

¶16    Eastman may prefer equal monthly installments because this would prevent Westlake from buying more committed EEQ in months where the contract-versus-market price differential is more favorable to Westlake and less committed EEQ in months where the price differential is more favorable to Eastman. But as discussed above, the ESA is designed to give Westlake the benefit of favorable price differentials at both the annual and monthly stages of EEQ sales—that is part of the benefit for which Westlake bargained.

### 3. Section 4(f) does not impose a strict December 31 deadline for third-party sale agreements but only authorizes one-year contracts, not spot sales.

¶17    Under Section 4(f), for any EEQ that Eastman included in its annual nomination and Westlake did not commit to buy (hereafter, Uncommitted EEQ), Eastman may pursue "third party ethylene sales agreements for such one year period."[38] If such Uncommitted EEQ is sold to a third party in compliance with Section 4(f), it need not be included in Eastman's monthly nominations and Eastman is entitled to free exchange of it.[39] If such Uncommitted EEQ is not sold to a third party in compliance with Section 4(f), it must be included in Eastman's

---

[37] *Terrell*, 297 A.3d at 620 n.37; *Dunlap*, 878 A.2d at 441–42.

[38] ESA § 4(f)–(g).

[39] *Id.*; *see* Part A(4), *infra.*

monthly nominations and free exchange is limited under the terms of Section 4(e).[40] The parties dispute what third-party sales satisfy Section 4(f).

¶18    Westlake argues that the third-party contracts authorized by Section 4(f) must be entered by December 31 of the prior year. Although Section 4(f) does not expressly impose a deadline, Westlake argues that an end-of-year cutoff is apparent because the EEQ at issue is the EEQ "for the following year" and the third-party contracts must be for "such one year period."[41] Westlake also advances a practical argument in support of its position: if Eastman secured the third-party contract after December 31, the contract would "not be confined to the calendar year for which the annual nomination applies" and "interfere with the next year's annual nomination, wherein Eastman is contractually obligated to offer *all* EEQ it intends to produce."[42] Westlake further argues that spot contracts are "one-time sales on 'spot' to third parties," and thus do not satisfy Section 4(f).[43]

¶19    Eastman responds that the ESA does not mention a December 31 deadline and argues that spot contracts are "third party ethylene sales agreements" under Section 4(f).[44]

---

[40] ESA § 4(e), (f); *see* Part B, *infra.*

[41] MSJ at 18–22.

[42] *Id.* at 18.

[43] *Id.* at 20.

[44] MSJ Resp. at 28–31; *see also* ESA § 4(f). Eastman also relies on course-of-performance evidence, which is addressed separately below. *See* "Evidentiary Rulings," Part A(2), *infra.*

¶20    Section 4(f) does not mention December 31, and the Court will not write such a deadline into the parties' contract. However, the Court agrees with Westlake that third-party contracts under Section 4(f) must have a one-year term and that year must be the calendar year following the annual nomination.[45] The only EEQ Section 4(f) authorizes Eastman to sell to third parties is EEQ offered by Eastman and declined by Westlake in the annual nominations for the coming year (i.e., Uncommitted EEQ),[46] and Section 4(f) expressly limits such third-party sales to "sales agreements for such one year period."[47] Thus, third-party sales under Section 4(f) must be pursuant to one-year contracts for the nomination year. Because spot sales do not meet these parameters, they do not satisfy Section 4(f).

¶21    Importantly, if Section 4(f) covered all third-party sales of Uncommitted EEQ, as Eastman indicates, Westlake's right to a second bite at the apple through the monthly nominations process would be impuissant.[48] Under Eastman's construction, whether Uncommitted EEQ would have to go through the monthly nominations process would be at Eastman's option—i.e., Eastman could look at current market prices each month and decide whether to offer the EEQ to

---

[45] ESA § 4(f).

[46] *Id.*

[47] *Id.*

[48] *See id.* ("For any or all of such [EEQ] that Westlake does not commit to purchase or that Eastman has not contracted to sell to a third party, the monthly nomination process described above will apply.").

Westlake first or a third party first, in light of how the market price compared to the ESA price. But the ESA contemplates the exact opposite. The ESA's annual and monthly nominations are structured to give Westlake two rights of first refusal on EEQ: first, a right of first refusal on annual purchase contracts, after which Eastman can pursue annual purchase contracts with third parties; second, a right of first refusal on short-term sales, after which Eastman can pursue short-term sales to third parties.[49] Under this process, it is Westlake, not Eastman, that has the option to take advantage of favorable market prices on monthly EEQ. In exchange, Eastman gets free exchange of the EEQ Westlake does not purchase.[50]

¶22    While Section 4(f) does not impose a strict December 31 cutoff for third-party contracts, its requirement for one-year contracts for the nomination year naturally limits Eastman's ability to enter into such after the calendar year has commenced. A contract entered and commenced on January 1 and ending December 31 may suffice, and because nominations and deliveries are handled month-by-month under the ESA, it may be possible to enter a contract on, say, January 15 that still runs from January 1 through December 31. But a third-party contract entered on June 1, for example, would not satisfy Section 4(f) because its term either would not be for "one year" or would not be limited to nomination year. The ESA's

---

[49] *See id.* §§ 4(e)–(g), 5.

[50] *See id.* § 8(b). This right is, of course, subject to the contract terms.

14

requirement that Eastman prorate EEQ on an approximately equal monthly basis also places practical constraints on the timing of third-party contracts under Section 4(f).[51]

### 4. Eastman is entitled to free exchange of EEQ sold to third parties in compliance with Subsection 4(f).

¶23    The ESA defines "Exchanged Ethylene" as "[a]ll quantities of ethylene exchanged hereunder," and mandates that, unless otherwise provided, "Westlake shall not charge Eastman for exchanging Exchanged Ethylene[.]"[52]

¶24    Westlake argues that the ESA provides for exchange of only ethylene that goes through the monthly nomination process, not ethylene sold to third parties after the annual nominations process. In support, Westlake points out that Sections 4(e) and (g) of the ESA tie Eastman's exchange right to the EEQ for a given month. But determining exchange amounts on a month-by-month basis does not equate to limiting exchange amounts to EEQ that goes through the monthly nomination process. Under the ESA, all EEQ delivery or exchange quantities are determined on a monthly basis—whether Westlake opts to purchase it in the annual nomination process or the monthly nomination process or not at all—and payments are likewise calculated on a monthly basis.[53] Even Purchased Ethylene quantities were allocated

---

[51] *Id.* § 4(e). This requirement is subject to certain contractual exceptions for occurrences, such as planned turnarounds, equipment breakdown, strike, and acts of God. *Id.* § 6, Attachment A at § 6.

[52] ESA at 1, § 8(b).

[53] *Id.* § 4(e), (g); *see also id.* § 4(b).

by month.[54] Likewise, the ESA's EEQ caps are allocated by month.[55] In short, numerous aspects of the ESA are tied to monthly periods without necessarily being tied to the monthly nominations process.

¶25    Section 4(e) opens by requiring Eastman to prorate EEQ on an approximately equal monthly basis. The next sentence has two parts. The first grants Westlake a purchase right, and the second grants Eastman an exchange right:

> [Part 1]
>
> Westlake shall have the option to purchase all or any portion of the [EEQ] for such month as nominated by Eastman at the price set out below,
>
> [Part 2]
>
> or to the extent that Westlake does not elect to purchase all of the [EEQ] for such month, Eastman shall be able to exchange a quantity of ethylene up to the difference between the total [EEQ] for such month and the quantity of [EEQ] that Westlake has elected to purchase for such month, according to the terms of exchange set out in this Contract.[56]

¶26    The parties do not dispute that Part 1 entitles Westlake to buy any or all of Eastman's monthly nominated EEQ. Part 2 may be read to mean that Eastman is entitled to exchange the EEQ quantity not purchased by Westlake in a given month, regardless of whether the EEQ was included in monthly nominations. The

---

[54] *Id.* § 4.

[55] *Id.* § 4(b).

[56] *Id.* § 4(e).

reference to the "total" EEQ in Part 2—a notable difference from the reference to "nominated" EEQ in Part 1—supports this conclusion.[57] Conversely, Part 2 may be read to grant an exchange right only as to the "total [EEQ] *{nominated}* for such month"—after all, that is the subject of Part 1. Either reading may be reasonable in a vacuum, but only the first reading is reasonable when read in the context of the ESA as a whole.[58]

¶27    First, Section 4(g) states:

*In the event that Westlake does not elect to purchase any or all of the [EEQ] for any month and Eastman elects to exchange* ethylene in accordance with the terms and conditions of this section, Eastman ethylene will be delivered to the Longview ethylene grid for Westlake's account or consumption, and Westlake will deliver a like kind and equivalent quantity of ethylene to Eastman at Eastman's leased storage at the Williams terminal in Mont Belvieu, or at such other mutually agreeable locations.[59]

¶28    In other words, each month, Eastman can elect to exchange any EEQ Westlake does not buy. Unlike Section 4(e), Section 4(g) contains no reference to monthly nominations or other basis for implicitly limiting this language to monthly

---

[57] *Id.*

[58] Similarly, the ESA's opening paragraph states: "Westlake agrees to purchase or exchange all or part of the [EEQ] in such quantities and pursuant to such terms of sale and/or exchange as described below." ESA at 1. Here too, in a vacuum, the reference to "all or part" of the EEQ could reasonably be understood to indicate that, subject to the ESA terms, (a) Westlake was agreeing to purchase all of the EEQ, exchange all of the EEQ, or purchase part and exchange the other part or (b) Westlake was free to neither purchase nor exchange any part of the EEQ. But here too, when read in the context of the ESA as a whole, it is evidence that the parties intended the first meaning.

[59] *Id.* § 4(g) (emphasis added).

nominated EEQ. To the contrary, it expressly applies to "any or all" EEQ not purchased by Westlake for the month, which includes EEQ sold to third parties under Section 4(f).[60] Moreover, while this language does link Eastman's exchange right to Westlake's option to purchase the EEQ, Westlake has the option to purchase EEQ contracted to third parties under Section 4(f) during the annual nominations.[61]

¶29    Second, Section 7 states: "During the Term, Westlake is obligated to deliver [EEQ] which are not purchased by Westlake to Eastman … in Mont Belvieu … in such quantity as requested by Eastman."[62] This obligation plainly covers all EEQ not purchased by Westlake (not just EEQ not purchased by Westlake during monthly nominations) and gives Eastman the right to invoke the obligation. Neither Section 7 nor any other section provides for Eastman to pay Westlake for such an exchange.[63] This is consistent with the understanding that the parties intended EEQ not purchased by Westlake to be "Exchanged Ethylene" under Section 8(b)'s free-exchange provision.

---

[60] *Id.* §§ 4(a) (defining EEQ), 4(g).

[61] *Id.* § 4(f).

[62] *Id.* § 7.

[63] *Id.* § 7. For simplicity, this opinion refers to a Mont Belvieu or Longview delivery location when that is the principal location noted in the ESA, even if the ESA authorizes the parties to agree to other locations. Nothing herein is intended to be exclusive of, or to restrict the parties' rights to mutually agree to, other locations.

¶30　Notably, the structure of Section 7, which governs delivery of ethylene to Eastman, parallels the structure of Section 8(b), which governs pricing for ethylene delivered to Eastman. Both provisions first address Westlake's Longview-to-Mont-Belvieu exchange of EEQ that Westlake opted not to purchase, which Section 8(b) requires to be free.[64] Next, both provisions address Westlake's Mont-Belvieu-to-Longview exchange of ethylene Eastman buys from another seller outside the ESA, for which Section 8(b) sets a fee.[65] The natural implication is that ethylene Westlake delivers to Eastman falls within one of these two categories: free exchange of EEQ from Longview to Mont Belvieu or the set-price exchange of outside ethylene from Mont Belvieu to Longview.[66]

¶31　Third, Section 6 of the ESA, which is an "Enforcement Clause," demonstrates what the parties considered to be the principal means of breaching the ESA: for Eastman, failure to deliver the EEQ Westlake accepted for purchase;[67] for Westlake, refusal to buy EEQ it accepted for purchase *or refusal to exchange the EEQ*

---

[64] *Id.* §§ 7, 8(b).

[65] *Id.* §§ 7, 8(b).

[66] Notably, Section 7 expressly refers to outside ethylene Eastman may buy from another supplier as Exchanged Ethylene. *Id.* § 7. This is inconsistent with Westlake's theory that only ethylene that goes through the monthly nominations process constitutes Exchanged Ethylene. It is also inconsistent with the proposition that delivery and exchange are two entirely separate things under the ESA. The ESA frequently refers to Exchanged Ethylene as being "delivered" to the receiving party. *Id.* §§ 4(g), 5, 7.

[67] *Id.* § 6.

*it did not accept for purchase.*[68] Section 6 authorizes Eastman to undertake severe enforcement measures—essentially, a shut-in of the Longview polyethylene facilities—in the event Westlake fails to pay for the EEQ it accepted for purchase or fails to exchange the nonaccepted EEQ.[69] This enforcement right is expressly tied to failure to exchange any EEQ Westlake did not accept, not just EEQ that went through the monthly nominations process.[70] It would make no sense for the ESA to empower Eastman to shut-in Westlake's facilities for failing to exchange such EEQ if the agreement did not obligate Westlake to make such an exchange.

¶32 Fourth, although the ESA provides detailed terms for all other aspects of the parties' treatment of EEQ—e.g., EEQ sale obligations, EEQ purchase rights, EEQ exchange, situations in which Westlake seeks to transport EEQ beyond Mont Belvieu—it makes no mention of any pipeline tariffs or any terms for a situation in which Eastman would be required to pay for EEQ exchange.[71] In light of the ESA's careful coverage of all other EEQ-related transactions between the parties, it would be incongruous for the ESA to make no mention at all of payment for exchange of third-party-contract EEQ if the parties expected that to occur.

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] In comparison, it sets a specific price for exchange of non-EEQ that may be exchanged under the ESA. *Id.* §§ 7, 8(b).

¶33 Finally, the ESA consistently paints Westlake's purchase and exchange obligations for EEQ as a binary choice: "Westlake agrees to purchase or exchange,"[72] "Selling or Exchanging [EEQ] to Westlake,"[73] "[i]n the event Westlake refuses to purchase … the accepted [EEQ] or to exchange the non-accepted [EEQ] … ,"[74] "[Westlake's] purchase or exchange obligations pursuant to this Contract."[75] This is consistent with the overarching theme of the ESA that, when the parties comply with its terms, Westlake will either buy or exchange the EEQ.

## B. Monthly Nominations

### 1. Westlake is entitled to buy any EEQ not committed under Section 4(f), and Eastman is entitled to free exchange of any portion Westlake does not buy.

¶34 Westlake argues that: Eastman's monthly nominations must include all EEQ it will produce in the corresponding month that is not already contracted for sale to a third-party under Section 4(f); Westlake has a right to purchase any or all such nominated EEQ; and Eastman is only entitled to exchange the portion Westlake does not purchase. Under this construction, Eastman would not be entitled to free exchange of ethylene it stores in its inventory in Tyler, Texas, because it was not produced in the corresponding month.[76] Eastman does not dispute Westlake's

---

[72] ESA at 1.

[73] *Id.* § 4(a).

[74] *Id.* § 6.

[75] *Id.*

[76] MSJ at 32–33.

right to purchase monthly nominated EEQ but does dispute that monthly nominations and free exchange are limited to the month of production. Eastman points out that: the ESA requires Eastman to prorate its EEQ in approximately equal monthly basis, and Eastman needs to be able to use inventory ethylene to smooth out monthly nominations when production varies; when operational issues cause Eastman to produce less in a month than nominated, Eastman uses inventory ethylene to make up the difference; and all ethylene in Longview is added to the same distribution grid such that there is no meaningful way to determine whether ethylene came from inventory or the crackers.[77]

¶35 The Court agrees in part and disagrees in part with both parties. As discussed above, Eastman's monthly nominations must include all EEQ that is not already committed to Westlake or a third-party under Section 4(f), and Westlake has a right to purchase any or all such nominated EEQ, but Eastman's exchange rights are not limited to monthly nominations for sale.[78] The Court disagrees that Westlake's monthly nominations are limited to the EEQ produced in the corresponding month. The ESA limits EEQ to ethylene produced by the two Longview crackers, but nothing in the ESA limits monthly nominations to EEQ produced in the corresponding month. If the parties wanted to impose such a

---

[77] MSJ Resp. at 5–6, 19–22.

[78] *See* Part A(3)–(4), *supra.*

limitation, they knew how to do so, as they expressly limited annual nominations to the EEQ Eastman "intends to produce in the following year."[79] Additionally, as Eastman points out, injecting such a limitation would conflict with the ESA's mandate that Eastman prorate the EEQ on an approximately equal monthly basis.[80]

### 2. The ESA does not provide for free exchange of converted/tolled ethylene.

¶36    The ESA defines EEQ to exclude five categories of ethylene produced by Eastman in Longview (the non-EEQ).[81] One such category is ethylene "converted on behalf of Eastman,"[82] sometimes referenced as "tolled" ethylene because it is converted under a tolling agreement. Westlake argues that Eastman is not entitled to free exchange of tolled ethylene because it is excluded from the definition of EEQ, and the ESA provides free exchange only for EEQ that is declined in the monthly nominations process.[83] In response, Eastman does not point to any language in the text of the ESA to support its position but does argue that Westlake provided free exchange of tolled ethylene in the past.[84]

---

[79] ESA § 4(f).

[80] *Id.* § 4(e).

[81] *Id.* § 4(a)(i)–(v).

[82] *Id.* § 4(a)(iii).

[83] MSJ at 29–34.

[84] MSJ Resp. at 24–26, 36–38. Eastman's course-of-performance evidence is addressed separately below. *See* "Evidentiary Rulings," Part A(4), *infra.*

¶37 The Court disagrees with part of Westlake's rationale but agrees with its conclusion. As addressed above, free exchange under the ESA is not limited to EEQ that is declined in the monthly nomination process—it also applies to EEQ that is sold to a third party under Section 4(f). But the ESA only provides free exchange for EEQ. Throughout the ESA, Westlake's exchange obligations are tied to EEQ and inextricably tied with Westlake's purchase options, which only extend to EEQ.[85] The ESA recognizes an exchange right for ethylene that is not EEQ in one instance: ethylene Eastman buys from another seller (delivered Mont-Belvieu-to-Longview).[86] But that exchange is not free; the ESA sets a price for it.[87] If the parties desired to obligate Westlake to exchange non-EEQ—either for free or for a fee—they clearly knew how. They chose not to do so.

¶38 Moreover, there is a distinct difference between the ESA's treatment of EEQ and non-EEQ. The ESA is focused almost entirely on EEQ, and its structure and text convey an intent to cover the parties' EEQ-related dealings globally. Conversely, the EEQ mentions converted/tolled ethylene *only* to exclude it from the definition of EEQ and outline a circumstance in which it could be added to EEQ.[88] In short, the ESA is about EEQ and addresses tolled ethylene only as it relates to

---

[85] ESA at 1, §§ 4(e), 4(g), 5–6.

[86] *Id.* §§ 7, 8(b).

[87] *Id.* § 8(b).

[88] *Id.* § 4(a)(iii), 4(c)(B).

EEQ. It makes sense, then, that an exchange of EEQ between the parties constitutes an exchange under the ESA,[89] which Westlake must provide at no charge;[90] but an exchange of tolled ethylene would not constitute an exchange under the ESA, and any exchange terms would have to be negotiated by the parties.

¶39    This is also consistent with the ESA's overarching tradeoff: Westlake gets a right of first refusal (and sometimes a second right of refusal) on EEQ and Eastman gets free exchange for any EEQ Westlake does not elect to buy. Conversely, Westlake has no right of first refusal on Eastman's converted/tolled ethylene, and Eastman does not get free exchange.

¶40    Finally, while Eastman asserts that Westlake's interpretation would leave its tolled ethylene "stranded" in Longview, the ethylene could still be exchanged by Westlake outside the ESA—it merely might not be free.[91]

## C.    Summary

¶41    With respect to the disputes discussed above, when read as a whole, the ESA is unambiguous and the only reasonable interpretation is as follows: In the annual nominations, Eastman must offer to sell Westlake all EEQ Eastman intends to produce in the following year. For any portion Westlake timely commits to buy,

---

[89] *Id.* at 1 (defining "Exchanged Ethylene").

[90] *Id.* § 8(b).

[91] There is also some evidence indicating that ethylene could be converted locally, without the need to move it outside of Longview. MSJ Exh. 4 at 189–90.

the ESA does not mandate equal monthly installments. For any portion Westlake does not timely commit to buy, Eastman may sell it to third parties under one-year contracts for the calendar year to which the annual nomination applies. EEQ sold to a third party under such contracts is exempt from the monthly nominations process in Section 4(e) and entitled to free exchange. In the monthly nominations process, Eastman must offer, and Westlake is entitled to elect to buy, any EEQ not already committed to Westlake or a third party in compliance with Section 4(f). Eastman is entitled to free exchange of any EEQ quantities offered to, but not purchased by, Westlake in monthly nominations for that month.

## Evidentiary Rulings

¶42    The parties dispute whether course-of-performance evidence may be considered in the absence of ambiguity, and both parties have filed objections to the other party's summary-judgment evidence, which the Court addresses below.

### A.    The Course-of-Performance Evidence

¶43    The Delaware UCC defines "course of performance" as "a sequence of conduct between the parties to a particular transaction that exists if:"

(1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.[92]

¶44    Under the Delaware UCC, the parties' course of performance "is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."[93] The parties' agreement should be construed as consistent with their course of performance whenever reasonable, but if such a construction is not reasonable, the agreement's express terms prevail over course of performance.[94]

¶45    Eastman relies on these provisions to argue that the Court should consider course-of-performance evidence in construing the ESA.[95] Westlake disputes that the UCC applies to the ESA.[96]

¶46    The ESA reflects a "hybrid" transaction—i.e., one involving both the sale of goods[97] (ethylene) and the provision of services (the exchange of ethylene).[98] In such transactions, if the sale-of-goods aspect of the transaction dominates, the

---

[92] DEL. CODE tit. 6, § 1–303(a). Course of performance may also be relevant to issues of waiver or modification. *Id.* § 1–303(f).

[93] *Id.* § 1–303(d).

[94] *Id.* § 1–303(e), (e)(1).

[95] Eastman's Response to Westlake's MSJ (MSJ Resp.) at 10–11; DEL. CODE tit. 6, § 2–202(a).

[96] Westlake's Reply in Support of its MSJ (MSJ Reply) at 11–12.

[97] *See* DEL. CODE tit. 6, § 2-105(1) (defining "goods").

[98] *See* DEL. CODE tit. 6, § 2-106(5) (defining "hybrid transaction").

Delaware Uniform Commercial Code (UCC) applies, though not necessarily to the exclusion of other law.[99] If the sale-of-goods aspect does not dominate, only the Delaware UCC provisions that "relate primarily to the sale-of-goods aspects of the transaction apply, and the provisions that relate primarily to the transaction as a whole do not apply."[100]

¶47　The Court concludes that the sale-of-goods aspect of the ESA is not dominant; the services aspect is equally important. As a result, only the Delaware UCC provisions that relate primarily to the sale-of-goods aspects of the transaction apply.[101] The issues on which the parties have submitted course-of-dealing evidence (discussed below) relate to the services aspect of the ESA: the parties' rights and obligations regarding free exchange. The Court therefore **HOLDS** that the Delaware UCC does not authorize the Court to consider course-of-performance evidence to determine the parties' exchange rights and obligations under the ESA, which is unambiguous. The Court thus reaches its conclusions above based on the four corners of the ESA, without resort to course-of-performance or any other extrinsic evidence. But if the Court were to consider the Eastman's putative "course of performance" evidence, the result would be the same for the reasons below.

---

[99] *Id.* § 2-102(2)(b).

[100] *Id.* § 2-102(2)(a).

[101] *Id.* § 2-102(2)(a).

### 1. Eastman's "course of performance" evidence is consistent with the right to free exchange of EEQ contracted to third parties under Section 4(f).

¶48    Eastman's summary-judgment evidence demonstrates that Westlake knowingly provided free exchange for EEQ Eastman identified as sold to third parties under Section 4(f) in January,[102] February,[103] March,[104] April,[105] and May[106] of 2011. There is also evidence that, as of November 2013, Westlake had not charged Eastman for exchange of EEQ purportedly sold to third parties under Section 4(f).[107] And there is evidence that Westlake continued to offer free exchange for EEQ putatively sold to third parties under Section 4(f) after November 2013—at least until this lawsuit was filed.[108] Westlake has not pointed to any evidence of an instance in which it objected to, or did not provide, free exchange for EEQ that Eastman identified as contracted to third parties under Section 4(f).[109] This evidence

---

[102] MSJ Resp. Exh. 13 at 54–60.

[103] *Id.* at 79–83.

[104] *Id.* at 84–87, Exh. 32.

[105] MSJ Resp. Exh. 13 at 87–88.

[106] MSJ Resp. Exh. 12, Exh. 13 at 95–97.

[107] MSJ Resp. Exh. 13 at 195–98. At least some of the exchanges during that period expressly identified EEQ as sold to third parties under Section 4(f). *See, e.g.*, MSJ Resp. Exh. 14 (Feb. 2012), Exh. 51 (Jan. 2012), Exh. 52 (Feb. 2013); MSJ Exh. 27–28 (Nov. 2013); *see also* nn. 102–06, *supra.*

[108] The summary-judgment evidence indicates that there would have been no third-party contracts under Section 4(f) in 2014 through 2018 (or in 2008), because Westlake purchased all of Eastman's annually nominated EEQ. But the evidence shows that Westlake provided free exchange for EEQ contracted under Section 4(f) in 2019 and thereafter. *See* MSJ Resp. Exh. 1 at 18–21, 42–48, Exh. 18, Exh. 19, Exh. 23; *see also* Exh. 1 at 12.

[109] Westlake points to exhibits 29 and 30 as evidence that Eastman sometimes paid to exchange ethylene, but these exhibits relate to exchanges in 2014—a year in which Westlake purchased all of the EEQ Eastman offered in its annual nomination, such that there could be no Section 4(f) third-

is consistent with the Court's conclusion that the ESA authorizes free exchange of EEQ contracted to third parties in compliance with Section 4(f).

### 2. Eastman's "course of performance" evidence cannot be used to read the explicit "one year" requirement out of Section 4(f).

¶49    In support of its position that third-party contracts under Section 4(f) need not be executed before December 31, Eastman points to the following evidence: (a) deposition testimony in which a Westlake witness, Lowell Sykes, testifies to his understanding that free exchange was available only if the third-party sale had been contracted before the month of exchange and that he never communicated with Eastman about a December 31 deadline[110] and (b) a handful of emails between 2020 and 2024 in which Sykes states that Westlake will exchange (at no cost) EEQ that was "contracted to sell prior to" the month for which exchange was requested.[111] The Court agrees with Eastman that the ESA does not impose a December 31 deadline, but if Eastman relies on this evidence to show that Section 4(f) contracts need not be "one year" contracts, the Court disagrees.

¶50    Determinatively, when read in light of the ESA as a whole, Section 4(f) cannot reasonably be construed to authorize third-party contracts that are not for a

---

party contracts. *See* MSJ Exhs. 29–30; *see also* ESA at § 4(f). The ethylene for which Eastman seeks exchange appears to be converted ethylene, addressed below. Around November 2013, Westlake challenged Eastman's putative right to free exchange of converted ethylene.  *See* MSJ Exh. 28.

[110]MSJ Resp. Exh. 1 at 162:6–14, 15–19.

[111] MSJ Resp. Exhs. 40–44; *see also* MSJ Resp. Exhs. 18–19.

one-year period, and the ESA's express terms prevail over any contrary course-of-performance evidence.[112] Regardless, the Court is not convinced that the evidence in question establishes a course of performance. The ESA does involve repeated occasions for performance by the parties,[113] but it is not clear to the Court that the evidence establishes a sequence of conduct in which Westlake, repeatedly and with the necessary knowledge, accepted or acquiesced in performance by Eastman that differs from the Court's interpretation of Section 4(f).[114]

¶51 First, the emails Eastman cites relate to several months in 2020–2024 but do not show anything about how the parties performed from 2007 through 2019—the bulk of performance under the ESA.[115]

¶52 Second, these emails do not establish that the parties' *actual* performance was inconsistent with the interpretation of Section 4(f) adopted here. The emails tend to show that the EEQ exchanged in those instances was (reportedly) contracted to third parties prior to the month of exchange, but that does not rule out the possibility that the sales were under one-year contracts covering the applicable

[112] DEL. CODE tit. 6, §§ 1–303(e)(1), 2–202(a).

[113] *Id.* § 1–303(a)(1).

[114] *Id.* § 1–303(a)(2).

[115] MSJ Resp. Exh. 40 (March 2020), Exh. 41 (February 2021), Exh. 42 (January 2022), Exh. 43 (June 2023), Exh. 44 (April 2024); *see also* MSJ Resp. Exh. 19.

calendar year.[116] There is also some evidence that Westlake sought but was not provided Eastman's third-party contracts during this period, such that Westlake may not have been able to determine whether Eastman's third-party contracts satisfied Section 4(f) at the time of this performance.[117]

### 3. The "course of performance" evidence does not establish that Westlake must buy Committed EEQ in equal monthly installments.

¶53    Eastman argues that course-of-performance evidence demonstrates that Westlake is obligated to purchase Committed EEQ in equal monthly installments, pointing to: (a) testimony from Westlake employee Amy Moore that Westlake tried to purchase Committed EEQ on a ratable basis during her tenure and (b) emails to Amy Moore in which Eastman conveyed the amounts of its monthly nominations and exchange requests, and also noted the amount of Committed EEQ for the year and what that worked out to on a ratable monthly basis.[118] Even if the

---

[116] MSJ Resp. Exhs. 40–44; *see also* MSJ Resp. Exh. 19. The language in the emails that Eastman relies on appears to have arisen out of the parties' dispute around the beginning of this period over whether Uncommitted EEQ must be included in Eastman's monthly nominations. *See* MSJ Resp. Exhs. 35–36, 42, 63. While the email language indicates that exchange is being provided for EEQ contracted to third parties before the month of exchange, it does not expressly state that third-party contracts can be entered *at any time* before the month of exchange. Sykes may have been expressing a view that EEQ not contracted to a third party before the month of the exchange is not eligible for exchange unless it goes through the monthly nominations, without intending to express a view as to whether a third-party contract for a term of less than one year, or for a one-year term other than the annual-nomination year, would be sufficient.

[117] MSJ Exhs. 38–40. In at least one instance, Eastman represented to Westlake that the amounts it sought to exchange had been sold to a third party after annual nominations and before the date of the mail, which was December of the year before the requested exchange. MSJ Resp. Exh. 42.

[118] MSJ Resp. at 36–37 and Exh. 54.

Court considered this evidence, it would not be persuaded to alter the plain and unambiguous contract terms.

¶54 First, the evidence Eastman cites does not establish that Westlake consistently purchased its annual commitments in equal monthly installments—a fact that Westlake disputes and which Eastman admits was not the case in at least some instances.[119] Westlake's decision to purchase in equal installments on some occasions is not equivalent to an admission that Westlake was obligated to do so on all occasions. A party who may choose option A or option B for contractual performance does not abandon its claim to option B merely by choosing option A on some occasions. Meanwhile, Westlake's decision not to purchase in equal installments on other occasions *is* inconsistent with Eastman's position that Westlake was obligated to always do so.

¶55 Second, the evidence Eastman relies on does not necessarily support its position. For example, although Moore sometimes referred to the ratable amount as a "minimum" purchase for the month and testified that Westlake tried to purchase Committed EEQ on a ratable basis during her tenure, she also testified that: Westlake did not always do so; she did not know if Westlake had a contractual obligation to do so; she did not think that there was anything stating when Westlake had to buy its annual commitments; and she thought that "the practicalities around

---

[119] MSJ at 34–36, Exh. 3 at 82, 245–46, Exhs. 37–40, 65–66; MSJ Resp. at 36–37, Exhs. 48–56.

it" would determine whether Westlake could wait until December to fulfill its purchase commitments because in some cases that would not be practical.[120]

¶56    As another example, Eastman relies on Response Exhibits 50 and 51. Exhibit 51 reflects the parties' communications about nominations for January 2012.[121] Eastman tells Westlake that Westlake committed to purchase 600 million pounds in 2012, which would be 50 pounds per month on a ratable basis, and Westlake elects to take only 47 million pounds in January.[122] Exhibit 50 shows Eastman's monthly production estimates for 2012, which ranged from a low of 24 million pounds in October to a high of 59 million pounds in March.[123] Under these projections it would have been impossible for Westlake to fulfill its 2012 purchase obligation in installments in equal monthly installments—or anything close to it. Westlake responded asking Eastman to spread out the 59 million pounds in March, and Eastman, which has an express obligation under the ESA to prorate its EEQ on an approximately equal monthly basis,[124] complied. But even under the new estimates, the variance in monthly production—now from a low of 23 million

---

[120] MSJ Resp. Exh. 13 at 149–56, 170–71, 174–76, 180–83.

[121] MSJ Resp. Exh. 51.

[122] *Id.*

[123] MSJ Resp. Exh. 50.

[124] ESA § 4(e).

pounds in October to a high of 56 million in June—would not have allowed Westlake to fulfill its annual purchase obligation in equal monthly installments.

¶57 Similarly, Exhibits 52, 53, and 55 are emails dealing with nominations for a month in 2013, 2014, and 2018, respectively, that contain the same type of language from Eastman about Westlake's Committed EEQ and what that amount is on a ratable monthly basis.[125] But none of these exhibits include a response in which Westlake commits to purchase the stated ratable amount for the month in question, much less every month of the year; most of these exhibits do not include any response from Westlake at all.[126] Exhibit 54 is an email from Westlake stating that it is "nominating 552 million pounds (46 million pounds per month) for the 2013 term," but Westlake does not expressly commit to accept 46 million each month.[127] And Westlake disputes that it purchased 46 million pounds per month in 2013.[128]

¶58 Exhibit 56 is a collection of emails showing that Westlake did purchase its 2018 annual commitment in equal monthly installments of 7 million pounds throughout 2018.[129] If Eastman had cited similar evidence for the other approximately 20 years of performance under this contract (and if such evidence

---

[125] MSJ Resp. Exhs. 52–53, 55.

[126] *Id.*

[127] MSJ Resp. Exh. 54.

[128] MSJ at 36.

[129] MSJ Resp. Exh. 56.

were properly considered), its course-of-performance argument would be much stronger. But Westlake's decision to purchase 7 million pounds in most months in 2018 is not, alone, evidence that it was obligated to do so, especially in light of the evidence that Westlake did not make its annual commitment purchase in equal amounts in other years.

### 4. The tolled-ethylene evidence does not demonstrate a consistent course of performance and cannot override the express contract terms.

¶59　Finally, Eastman relies on evidence tending to show that: (1) on multiple occasions in 2008 through 2013, Westlake exchanged ethylene Eastman identified as tolled ethylene;[130] and (2) in 2013, Westlake began refusing to exchange tolled ethylene unless Eastman paid the pipeline tariff, and at least on some occasions, Eastman did so.[131] The performance consistent with Eastman's view occurred first, but the performance consistent with Westlake's view covers a much larger timeframe. And while Eastman implies that Westlake's change in practice was retaliatory for a related dispute that arose between the parties around 2013, there are other, equally plausible explanations—including that Westlake simply discovered (as a result of the 2013 dispute or otherwise) that its employees

---

[130]　MSJ Resp. at 24–26 and Exhs. 27–32. The cited exhibits contain no discussion of exchange pricing terms of whether exchange would be free. *Id.* But Eastman asserts that these exchanges were free of charge, and Westlake does not dispute that in its reply. Additionally, there is at least some evidence in the record there was no charge for some or all of these exchanges. *See, e.g.*, MSJ Exh. 7 at 83, 86, 88, 96, 108–09, 111, 113, 116, 193.

[131] MSJ Exhs. 28–31, 51 at EMN0000965–78; MSJ Resp. Exh. 22

were handling tolled-ethylene exchange incorrectly and took action to correct the error.

¶60 Ultimately, the parties' performance activities are not entirely consistent. Moreover, as discussed above, the ESA's express terms prevail over any conflicting course-of-performance evidence.[132] While the ESA makes no mention of exchange of tolled ethylene, it is not silent as to when Eastman is entitled to exchange under the ESA or the cost of such exchange. As discussed above, the ESA grants Eastman a right of exchange as to two categories of ethylene: EEQ and ethylene purchased by Eastman from another seller.[133] And it provides pricing for both instances: no charge for EEQ and a pricing formula for ethylene purchased by Eastman.[134] Because the ESA's express terms address the scope of Eastman's exchange rights under the ESA, broadening those rights beyond the stated scope would materially change the contract terms rather than merely interpret or supplement them.[135]

---

[132] DEL. CODE tit. 6, §§ 1–303(e)(1), 2–202(a).

[133] *See* ESA at 1, §§ 4(e)–(g), 6, 7, 8(b); *see also* Part B(1)–(2), *supra.*

[134] ESA § 8(b).

[135] *See* DEL. CODE tit. 6, §§ 1–303(e)(1), 2–202(a); *see also, e.g., Nissan N. Am., Inc. v. Cont'l Auto. Sys., Inc.*, 503 F. Supp. 3d 555, 566 (M.D. Tenn. 2020) (applying corresponding UCC provision and holding that where purchase agreement's express terms limited its scope to parts bought under future purchase orders, indemnity obligations could not be expanded to parts bought under past purchase orders even though course-of-performance evidence showed defendants had defended other claims arising out of past purchase orders); *Driveline Retail Merch., Inc. v. PepsiCo, Inc.*, No. 4:17-CV-00423, 2018 WL 2298386, at *7 (E.D. Tex. May 21, 2018) ("The course of performance doctrine is ... not a means of creating contract obligations from whole cloth." (cleaned up; quoting

**B.    Eastman's Objections**

¶61    Eastman objects to Westlake's MSJ Exhibits 2–3, 9–13, 15–19, 33, and 52–54 as "extrinsic evidence of undisclosed internal contract interpretations."[136] The Court **SUSTAINS in part** and **OVERRULES in part** this objection.

¶62    Because the ESA's clear and unambiguous meaning is evident from its plain language and structure as a whole, and from the intent of the parties' as reflected within the four corners of the document, the Court does not resort to extrinsic evidence to ascertain its meaning. However, Eastman's objection does not apply to all of the evidence at issue.[137] Thus, the Court does not consider the objected-to evidence to the extent it constitutes extrinsic evidence of undisclosed internal contract interpretations. Ultimately, the admission or exclusion of these exhibits would not alter the result here, which is compelled by the ESA itself.

**C.    Westlake's Objections**

¶63    Westlake raises two objections to the summary-judgment exhibits filed by Eastman in support of its MSJ Response: hearsay and that they are counsel-created demonstratives. First, Westlake objects to Eastman's MSJ Response

---

*Wales v. Alliant Techsystems, Inc.*, No. 1:06-CV-622-TH, 2008 WL 11348350, at *3 (E.D. Tex. Oct. 24, 2008))).

[136] Eastman's Objections at 2–4.

[137] For example, some of the objected-to evidence reflects events that actually occurred (including course-of-performance evidence very similar to that on which Eastman itself relies) or general information about the ethylene trade. Notably, Exhibits 3 and 12 are entire depositions.

Exhibits 2–8 and 20 on hearsay grounds.[138] The Court **SUSTAINS** this objection with respect to Exhibits 2–7 and 20, and **OVERRULES** the objection as to Exhibit 8. Second, Westlake objects to Eastman's MSJ Response Exhibits 9–11 and 56 as counsel-created demonstratives.[139] The Court **OVERRULES** this objection.

¶64    Here too, the admission or exclusion of these exhibits would not alter the result here, as the ESA's unambiguous meaning is evident from its plain language and structure as a whole and from the intent of the parties as reflected within the four corners of the document, without resort to extrinsic evidence.

### Conclusion

¶65    For these reasons, the Court GRANTS in part and DENIES in part the MSJ and provides this construction of the ESA on the disputed terms. The Court SUSTAINS in part and OVERRULES in part both Eastman's Objections and Westlake's Objections, as detailed above.

Date signed: May 13, 2026

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division, *sitting by assignment in the Eleventh Division*

---

[138] Westlake's Objections at 1–2.

[139] *Id.*

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 114870978
Filing Code Description: No Fee Documents
Filing Description: Memorandum Opinion and Order on Motion for Summary Judgment
Status as of 5/14/2026 9:01 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Thomas Farrell | | tfarrell@mcguirewoods.com | 5/13/2026 5:31:26 PM | SENT |
| Kevin TJacobs | | kevin.jacobs@bakerbotts.com | 5/13/2026 5:31:26 PM | SENT |
| Kendall Black | | kendall.black@bakerbotts.com | 5/13/2026 5:31:26 PM | SENT |
| Laura McGonagill | | laura.mcgonagill@bakerbotts.com | 5/13/2026 5:31:26 PM | SENT |
| Jennifer R.Cook | | jrcook@mcguirewoods.com | 5/13/2026 5:31:26 PM | SENT |
| Kelly Choi | | kelly.choi@bakerbotts.com | 5/13/2026 5:31:26 PM | SENT |
| Nathan Thibon | | nathan.thibon@bakerbotts.com | 5/13/2026 5:31:26 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 5/13/2026 5:31:26 PM | SENT |
| Nikki Sims | | nsims@mcguirewoods.com | 5/13/2026 5:31:26 PM | SENT |
| Gregory J.DuBoff | | gduboff@mcguirewoods.com | 5/13/2026 5:31:26 PM | SENT |